# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA

FIRST KUWAITI GENERAL
TRADING & CONTRACTING W.L.L.,

|     | Movant, |
| --- | --- |
| v.  |         |

KELLOGG BROWN & ROOT
INTERNATIONAL, INC.,

Respondent.

No. 1:23-mc-00001

## FIRST KUWAITI'S BRIEF IN SUPPORT OF
## MOTION TO VACATE ARBITRAL AWARD

Dated:   January 5, 2023
         Washington, D.C.

Eric R. Nitz (Va. Bar No. 82471)
Robert K. Kry (*pro hac vice* forthcoming)
Robert Y. Chen (*pro hac vice* forthcoming)
MOLO LAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2021 (telephone)
(202) 536-2021 (facsimile)
enitz@mololamken.com

*Attorneys for Movant First Kuwaiti*
*General Trading & Contracting W.L.L.*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

PARTIES ................................................................................................................... 3

JURISDICTION AND VENUE ................................................................................. 4

STATEMENT OF FACTS ......................................................................................... 4

I.      First Kuwaiti's Subcontract with KBR ........................................................ 4

II.     KBR Settles Its Dispute with First Kuwaiti ................................................ 6

III.    KBR's Unsuccessful Litigation Against the U.S. Government ................... 8

IV.     The Tribunal's Award Shifting KBR's Losses to First Kuwaiti ................ 12

V.      The Tribunal's Article 30 Ruling .............................................................. 17

ARGUMENT ........................................................................................................... 19

I.      The Tribunal Awarded Damages on Claims That KBR Had Already Settled ................ 20

II.     The Tribunal Modified the Unambiguous Terms of Section 3.1 ............... 22

III.    The Tribunal Ignored First Kuwaiti's Section 3.3 Argument .................. 25

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re A.H. Robins Co.*,
238 B.R. 300 (E.D. Va. 1999)........................................................................26

*Badgerow v. Walters*,
142 S. Ct. 1310 (2022)...................................................................................4

*Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC*,
519 F.3d 200 (4th Cir. 2008) ..................................................................20, 23

*Courier-Citizen Co. v. Bos. Electrotypers Union No. 11*,
702 F.2d 273 (1st Cir. 1983)..........................................................................24

*Dewan v. Walia*,
544 F. App'x 240 (4th Cir. 2013) .........................................................20, 21, 23

*Houston & T.C.R. Co. v. McCarty*,
94 Tex. 298, 60 S.W. 429 (Tex. 1901) .........................................................21

*Patten v. Signator Ins. Agency, Inc.*,
441 F.3d 230 (4th Cir. 2006) ................................................................. *passim*

*Paul Morrell, Inc. v. Kellogg Brown & Root, Inc.*,
682 F. Supp. 2d 606 (E.D. Va. 2010) .............................................................3

*Peabody Holdings Co. v. United Mine Workers of Am.*,
815 F.3d 154 (4th Cir. 2016) .........................................................................3

*PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*,
659 F. Supp. 2d 631 (E.D. Pa. 2009) ......................................................25, 26

*Raymond James Fin. Servs., Inc. v. Bishop*,
596 F.3d 183 (4th Cir. 2010) .......................................................................19

*Rosetta Res. Operating, LP v. Martin*,
645 S.W.3d 212 (Tex. 2022)..........................................................................28

*Tempo Shain Corp. v. Bertek, Inc.*,
120 F.3d 16 (2d Cir. 1997)............................................................................26

*U.S. Postal Serv. v. Am. Postal Workers Union*,
46 F. Supp. 2d 457 (E.D. Va. 1999) .......................................................20, 23

*Matter of W. Tex. Mktg. Corp.*,
    12 F.3d 497 (5th Cir. 1994) ...............................................21

*Wachovia Sec., LLC v. Brand*,
    671 F.3d 472 (4th Cir. 2012) ...............................................19

*Matter of Warner-Chappell Music, Inc.*,
    224 A.D.2d 301 (N.Y. App. Div. 1996) ...............................................3

*Weiss v. Sallie Mae, Inc.*,
    939 F.3d 105 (2d Cir. 2019)...............................................21, 22

*Williamson Farm v. Diversified Crop Ins. Servs.*,
    917 F.3d 247 (4th Cir. 2019) ...............................................19

## Statutes and Rules

9 U.S.C. § 10 ...............................................1, 19, 21

9 U.S.C. § 10(a) ...............................................4

9 U.S.C. § 10(a)(3) ...............................................2, 26

9 U.S.C. § 10(a)(4) ...............................................3, 24, 25, 26

9 U.S.C. § 12 ...............................................3

28 U.S.C. § 1332(a)(2) ...............................................4

Fed. R. App. P. 4(a)(4)(A)(iv) ...............................................3

## Other Authorities

Texas Jurisprudence 3d *Compromise and Settlement* (rev. 2022)...............................................21

## INTRODUCTION

1.      This is a motion to vacate an arbitral award under Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10.  First Kuwaiti General Trading & Contracting W.L.L. ("First Kuwaiti") seeks to vacate an award rendered by a tribunal of the International Centre for Dispute Resolution ("ICDR") in *First Kuwaiti General Trading & Contracting W.L.L. v. Kellogg Brown & Root International, Inc.*, Case No. 50-20-0800-0148, to the extent it granted relief in favor of respondent Kellogg Brown & Root International, Inc. ("KBR").

2.      The arbitration arose out of First Kuwaiti's work for KBR in Iraq following the United States invasion in 2003.  KBR was the U.S. Army's prime contractor for logistical support, and First Kuwaiti was KBR's subcontractor.  KBR hired First Kuwaiti to procure and deliver trailers to Iraq to be used as living quarters.  The Army was supposed to provide armed escorts for deliveries and prepare the sites, but it prioritized other needs instead.

3.      KBR nonetheless told First Kuwaiti to continue delivering the trailers.  The result was massive backlogs, severe delays, and millions of dollars in additional costs.  First Kuwaiti continued to perform, relying on KBR's assurances of compensation.  First Kuwaiti ultimately sought more than $70 million.  KBR agreed to settle First Kuwaiti's claims for $48.75 million.

4.      When KBR sought reimbursement from the U.S. government, the government refused to pay the full amount.  KBR litigated that dispute with the government to the Armed Services Board of Contract Appeals ("ASBCA") and then to the U.S. Court of Appeals for the Federal Circuit.  The Federal Circuit held that KBR did not adequately prove the reasonableness of the amounts because, among other things, it relied on market prices rather than cost data.

5.      First Kuwaiti was not a party to those proceedings between KBR and the government.  KBR did not timely notify First Kuwaiti of the contracting officer's decision that spawned the appeals, and it ignored First Kuwaiti's repeated offers to assist.  Nonetheless, after

the Federal Circuit ruled that KBR failed to prove the reasonableness of its costs, KBR tried to pass on that adverse $48.75 million judgment to First Kuwaiti. It clawed back amounts it had already paid by deducting them from payments on unrelated subcontracts, and it refused to pay the rest. KBR thus tried to leave First Kuwaiti holding the bag even though KBR had already settled the claims with First Kuwaiti years earlier, and even though KBR's only justification for disregarding those settlements was KBR's own failure to prove the reasonableness of its costs in proceedings in which First Kuwaiti was not a party.

6. Incredibly, the arbitral tribunal accepted KBR's strategy. Disregarding the fact that KBR had ***settled*** its claims with First Kuwaiti, the tribunal allowed KBR to offset its entire $48.75 million loss. It did so on the basis of contractual provisions that, by their unambiguous terms, do not apply here.

7. The tribunal rendered a Final Award on July 11, 2022, a copy of which is attached as **Exhibit A**. On October 13, 2022, the tribunal granted in part and denied in part the parties' applications to correct or clarify the Award; a copy of that order is attached as **Exhibit B**. For reference, the Armed Services Board of Contract Appeals' November 19, 2018 opinion is attached as **Exhibit C** (ICDR Ex. 69), and the Federal Circuit's September 1, 2020 decision on review is attached as **Exhibit D** (ICDR Ex. 70).[1]

8. First Kuwaiti now seeks to vacate the Award insofar as it granted relief to KBR. Under the Federal Arbitration Act, this Court may vacate an award where the arbitrators committed any "misbehavior by which the rights of any party have been prejudiced," 9 U.S.C. § 10(a)(3), or where they "exceeded their powers, or so imperfectly executed them that a mutual,

___

[1] All exhibits are attached to the accompanying declaration. For exhibits to this motion that were also filed as exhibits in the arbitration, the arbitration exhibit numbers are noted parenthetically as "(ICDR Ex. __)."

final, and definite award upon the subject matter submitted was not made," *id.* § 10(a)(4). In addition, the Court may vacate an award "where [the] award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006). There are multiple grounds for vacatur here.

9.     First Kuwaiti retained undersigned counsel to prepare this submission on December 4, 2022. This motion is timely filed, and will be timely served, within three months of the tribunal's October 13, 2022, order granting in part the motions to correct or clarify the Award. *See* 9 U.S.C. § 12; *Peabody Holdings Co. v. United Mine Workers of Am.*, 815 F.3d 154, 159-60 (4th Cir. 2016); *Matter of Warner-Chappell Music, Inc.*, 224 A.D.2d 301, 301-02 (N.Y. App. Div. 1996) (limitations period starts when tribunal rules on motion to clarify award); *cf.* Fed. R. App. P. 4(a)(4)(A)(iv) (time to appeal runs from order on motion to amend judgment).

## PARTIES

10.    Movant First Kuwaiti General Trading & Contracting W.L.L. is one of the largest providers of construction services to the public sector in the Middle East. Ex. A ¶ 1. It has successfully performed several multi-million dollar projects for the U.S. government and its contractors, including approximately 70 subcontracts for KBR alone. Ex. C at 3. Among other projects, the U.S. Department of State awarded First Kuwaiti the contracts to build the new U.S. Embassy in Baghdad, the largest U.S. foreign mission ever built. Ex. A ¶ 1. First Kuwaiti is a limited liability company organized under Kuwaiti law with its principal place of business in Kuwait. Decl. ¶ 2. It is owned by Lebanese and Kuwaiti citizens. *Id.*

11.    Respondent Kellogg Brown & Root International, Inc., is a U.S. government contractor. Ex. A ¶ 1. It is a Delaware corporation with its principal place of business in Texas. *See Paul Morrell, Inc. v. Kellogg Brown & Root, Inc.*, 682 F. Supp. 2d 606, 610 (E.D. Va. 2010), *aff'd*, 453 F. App'x 322 (4th Cir. 2011).

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this motion to vacate pursuant to

28 U.S.C. § 1332(a)(2) because First Kuwaiti is a citizen of two foreign states (Kuwait and

Lebanon) while Kellogg Brown & Root International, Inc. is a citizen of two domestic States

(Delaware and Texas). *See Badgerow v. Walters*, 142 S. Ct. 1310, 1316 (2022) (motion under

Federal Arbitration Act requires an "independent jurisdictional basis").

13.     Venue is proper in this District under 9 U.S.C. § 10(a) because the award was

rendered in Arlington, Virginia, the legal seat of the arbitration.  Ex. A at 87.

## STATEMENT OF FACTS

14.     This dispute arises out of work that First Kuwaiti performed to support the

coalition forces in Iraq.  First Kuwaiti incurred substantial additional costs at KBR's direction.

KBR agreed to pay First Kuwaiti for that work but is now trying to renege on that promise.

**I.      First Kuwaiti's Subcontract with KBR**

15.     In 2001, the U.S. Army awarded KBR the LOGCAP III contract to provide

logistical support for the international military campaign the United States launched following

the September 11 attacks.  Ex. A ¶ 10.  After the United States invaded Iraq in 2003, the Army

faced a crisis due to its inability to provide living quarters to its troops.  "[S]oldiers slept

wherever they could in temperatures that could exceed 100 degrees.  The locations included

abandoned schools, public buildings, homes, tents, vehicles, the ground, or any other place

soldiers could put a sleeping bag."  Ex. C at 2.  To "provide facilities to escape harsh conditions

so soldiers could recharge for future missions," the military ordered KBR to procure thousands

of "containers or trailers containing specified furnishings, environmental units, [and] lighting . . .

to be delivered to multiple sites in Iraq."  *Id.*

16.     "KBR did not have the resources to perform that function itself." Ex. C at 2. "So it decided to subcontract out the complex logistical issues associated with purchasing the units, transporting them under extremely hazardous conditions that threatened life and equipment, installing them, and assuming the associated risks." *Id.* First Kuwaiti stepped up to fill that role. Ex. A ¶ 11. On October 17, 2003, First Kuwaiti and KBR executed Subcontract 11, by which First Kuwaiti agreed to procure and install thousands of trailers for coalition troops to use as living quarters in war-ravaged Iraq. **Exhibit E** (ICDR Ex. 1).

17.     Subcontract 11 initially provided that KBR would pay First Kuwaiti nearly $81 million for that work. Ex. E at 1. Two months later, KBR expanded the contract to include another location, bringing the total contract price to nearly $145 million. Ex. C at 4.

18.     Subcontract 11 authorized KBR to demand changes to the specifications, but required KBR to compensate First Kuwaiti for any additional costs by means of "equitable adjustments." Ex. E at General Conditions 8.1.1, 8.1.3 & Special Conditions 4.1, 4.4. The contract also entitled First Kuwaiti to equitable adjustments if the government's or KBR's failure to perform their own obligations caused a delay in work that substantially increased First Kuwaiti's costs. *Id.* at General Conditions 3.2.5.

19.     Section 3 of the Special Conditions, titled "Disputes," reads:

3.0 DISPUTES

3.1 Notwithstanding any other provision in this SUBCONTRACT, any decision of the Government's Contracting Officer pursuant to the contract between CONTRACTOR and the Department of the Army (Prime Contract) which binds CONTRACTOR shall bind both CONTRACTOR and SUBCONTRACTOR to the extent that it relates to the Subcontract, provided (1) CONTRACTOR promptly notifies SUBCONTRACTOR of the decision, and (2) if requested by the SUBCONTRACTOR, CONTRACTOR appeals the decision in accordance with the Disputes clause of the Prime Contract and takes whatever further action is required under this clause.

3.2 Any decision on the appeal, or any other decision of the Government under the Prime Contract that is binding on the CONTRACTOR and cannot be appealed under the Disputes clause of the Prime Contract, shall also bind the CONTRACTOR and the SUBCONTRACTOR to the extent that it relates to the Subcontract, provided CONTRACTOR promptly notifies SUBCONTRACTOR of the decision and, if requested by the SUBCONTRACTOR, brings suit or files a claim, as appropriate, against the Government. A final judgment in the suit shall be conclusive upon the CONTRACTOR and SUBCONTRACTOR.

3.3 If requested by the CONTRACTOR, SUBCONTRACTOR shall assume the burden or prosecuting for CONTRACTOR any appeal, suit, or claim initiated by CONTRACTOR at SUBCONTRACTOR'S request. Each party shall cooperate fully in assisting the other party in the proceedings. If any appeal, suit, or claim is prosecuted by CONTRACTOR under this clause, SUBCONTRACTOR shall be permitted to participate fully in the prosecution for the purpose of protecting its interests.

3.4 Pending any decision, appeal, suit or claim pursuant to this clause, SUBCONTRACTOR shall proceed diligently with performance of this SUBCONTRACT. All costs and expenses incurred by SUBCONTRACTOR and CONTRACTOR in prosecuting any appeal, suit or claim initiated by CONTRACTOR at SUBCONTRACTOR'S request shall be paid by SUBCONTRACTOR. The rights and obligations of CONTRACTOR and SUBCONTRACTOR under this SUBCONTRACT shall survive completion of, and final payment under, this SUBCONTRACT.

Ex. E at Special Conditions § 3.

## II.     KBR Settles Its Dispute with First Kuwaiti

20.     First Kuwaiti's trailers were to be shipped from Kuwait and delivered to camps in Iraq by truck convoys. Ex. D at 3. "Because there was a war on, [the supply route] was extremely dangerous. Insurgent attacks began in the spring of 2003 and people were shot and killed." Ex. C at 3 (citation omitted). Because of those risks, KBR's prime contract required the U.S. Army to provide "force protection" to convoys as they traveled through Iraq. Ex. D at 2-3.

21.     The Army, however, decided to prioritize other needs and failed to provide the escorts. Ex. D at 4. Substantial delays resulted as trucks and trailers backed up at the Kuwait/Iraqi border. *Id.* First Kuwaiti had to store trailers on rented land and incurred costs for double handling – *i.e.*, unloading and then reloading the trailers onto trucks. *Id.* at 4-5.

22. Once the trailers arrived at the camps, there were more delays. The military was supposed to prepare the sites by grading the land and covering the sites with gravel. Ex. C at 4. But the sites were not ready when the trailers arrived. *Id.* As a result, First Kuwaiti incurred still more double-handling costs as it had to offload trailers from delivery trucks and then reload them to move them to their permanent locations. *Id.* at 4-5.

23. Although First Kuwaiti suggested holding off on further deliveries until escorts were available and sites were ready, KBR insisted that First Kuwaiti plow ahead. KBR's subcontract administrator admitted that "KBR . . . ordered [First Kuwaiti] to perform double handling and . . . 'guaranteed' [First Kuwaiti] reimbursement of costs" for the additional work it performed. Ex. C at 5. KBR did so to ensure it could meet its own obligations to the government on time. Ex. A ¶ 156.

24. First Kuwaiti complied with KBR's instructions and then sought equitable adjustments for the more than $70 million in additional costs it incurred. **Exhibit F** at 6-7 (KBR Counterclaim Memorial). "KBR reviewed, analyzed, and negotiated the [requests] to a total settlement amount of $48,754,547, nearly $30 million less than [First Kuwaiti] initially sought." *Id.* at 7. KBR then issued two change orders reflecting the agreed-upon amounts on August 1 and 4, 2004. **Exhibits G and H** (ICDR Exs. 2 & 3).

25. As the tribunal explained, "[t]he change orders reflected *a settlement between KBR and [First Kuwaiti]* of two [First Kuwaiti] requests for equitable adjustment . . . due to additional work and delays caused by the U.S. Government." Ex. A ¶ 174 (emphasis added). KBR's orders themselves state that they reflect "additional costs incurred . . . as a direct result of U.S. Government caused delays" and that "[a]ll the work listed and accounted for was as per directions given by on-site KBR construction management." Ex. G § 1.0; Ex. H § 1.0.

## III.    KBR's Unsuccessful Litigation Against the U.S. Government

26.     Having agreed to pay First Kuwaiti an additional $48.75 million, KBR sought reimbursement from the government under its own prime contract.  On December 29, 2006, a Defense Contract Management Agency ("DCMA") contracting officer approved that payment in part.  **Exhibit I** (ICDR Ex. 18); Ex. A ¶ 178(d).  The contracting officer concluded that there was "clear evidence that the subcontractor experienced Government caused delays as corroborated by DCMA personnel and contemporaneous personal knowledge of the Contracting Officer."  Ex. I at 1.  He concluded that $25.6 million was immediately allowable but held back the remainder pending further documentation on discrete issues.  *Id.* at 2.

27.     On January 11, 2007, KBR told First Kuwaiti that the government proposed to settle KBR's claim for $35 million.  **Exhibit J** (ICDR Ex. 21); Ex. A ¶ 178(f).  KBR also asserted that "KBR's subcontract with you binds you and KBR equally to the decisions of the Government's contracting officer," although KBR did not cite any particular contract provision in support of that claim, and First Kuwaiti did not agree with that assessment.  Ex. J.

28.     On May 19, 2008, the DCMA suspended its partial approval of KBR's change orders.  **Exhibit K** (ICDR Ex. 30); Ex. A ¶ 178(i).  The basis for the suspension was a plea agreement that a KBR manager, Anthony Martin, entered into, claiming he had participated in a kickback transaction that also implicated a First Kuwaiti representative.  Ex. K.  First Kuwaiti has consistently denied those uncorroborated allegations.  **Exhibit L** (Appendix to Counterclaim Memorial Opposition).  Neither the Armed Services Board of Contract Appeals nor the Federal Circuit relied on those allegations in ruling on KBR's dispute with the government, and the arbitral tribunal refused to make any finding about them, recognizing that proceedings on Mr. Martin's claims remain ongoing.  Ex. A ¶¶ 185-195.  The DCMA's May 19, 2008 letter stated

that "KBR will be afforded an opportunity to provide additional supporting information from credible sources prior to issuance of a final contracting officer's decision." Ex. K at 1.

29.     On September 10, 2008, First Kuwaiti wrote the DCMA to dispute Mr. Martin's allegations. **Exhibit M** (ICDR Ex. 35). First Kuwaiti also made clear, however, that "DCMA's determinations have no effect upon the amounts KBR has already paid to [First Kuwaiti] in settlement, or upon [First Kuwaiti's] entitlement to such amounts – those rights and obligations already are settled between [First Kuwaiti] and KBR." *Id.* at 1.

30.     On November 4, 2010, KBR filed a certified claim with the DCMA, demanding reimbursement for the full $48.75 million. **Exhibit N** (ICDR Ex. 51); Ex. A ¶ 178(n). KBR requested a final written decision within 60 days. Ex. N at 1. There is no evidence in the arbitration record that KBR ever consulted with First Kuwaiti about that filing or even informed First Kuwaiti about the filing at the time.

31.     When the DCMA contracting officer failed to issue an opinion within 60 days, KBR's claim was deemed denied by operation of law. Ex. A ¶ 178(n). There is no evidence that KBR ever promptly notified First Kuwaiti about that deemed denial.

32.     On February 11, 2011, KBR filed an appeal from the deemed denial with the Armed Services Board of Contract Appeals. Ex. A ¶ 178(n). Again, there is no evidence that KBR consulted with First Kuwaiti before doing so or informed First Kuwaiti about the filing.

33.     On July 11, 2011, the DCMA contracting officer issued a final decision that granted KBR only $3.8 million out of its total claim. **Exhibit O** (ICDR Ex. 52); Ex. A ¶ 178(o). There is no evidence that KBR promptly notified First Kuwaiti about that ruling either.

34.     Over two months later, on September 22, 2011, KBR emailed First Kuwaiti about an upcoming mediation in the ASBCA appeal to invite a First Kuwaiti attorney to participate.

**Exhibit P** (ICDR Ex. 110). That email asserted that KBR had sent First Kuwaiti copies of the contracting officer's decision and KBR's claim, although the record does not contain copies of such communications or show the dates on which they were sent. *Id.*

35. As the tribunal found, "KBR has acknowledged [First Kuwaiti] had only a limited role in that mediation: '[T]hey're not a party to the mediation, they are not the decision-maker . . . .'" Ex. A ¶158 n.119. The mediation did not resolve KBR's appeal.

36. On February 14, 2012, First Kuwaiti's counsel wrote to KBR that "[First Kuwaiti] stands ready to continue to provide whatever assistance it can to KBR to help you obtain a fair resolution of this dispute through the formal appeals process." **Exhibit Q** (ICDR Ex. 126). Nonetheless, he added: "As we have discussed on a number of occasions in the past, [First Kuwaiti] strongly believes that it has no legal obligation to provide contribution or indemnification to KBR with regard to either the Contract 011 or the Martin matters." *Id.* There is no evidence that KBR ever responded to First Kuwaiti's offer to assist in the appeal.

37. On March 14, 2012, First Kuwaiti's counsel sent another email to KBR, stating: "I called you earlier today to check in, but also to inquire how [First Kuwaiti] might coordinate to assist KBR in its efforts to achieve the best possible outcome in the ASBCA proceeding. I look forward to hearing from you." **Exhibit R** (ICDR Ex. 127). Again, there is no evidence that KBR responded to that email or otherwise permitted First Kuwaiti to participate in the appeal.

38. After years of delays, on November 19, 2018, the ASBCA finally issued its decision on KBR's appeal. Ex. C. The Board ruled that the government did not breach its duty to provide force protection to the convoys. *Id.* at 8. It also ruled that KBR had not adequately proved the reasonableness of the additional costs incurred. *Id.* at 10. Among other things, the Board faulted KBR for relying on "reasonable market price[s]" rather than "what [First Kuwaiti]

actually paid" for the additional work.  *Id.*; *see also id.* at 12 (faulting KBR for relying on "rates and prices for its equipment and services, not costs").  Apart from First Kuwaiti's limited participation in the mediation at the end of 2011 and the start of 2012, there is no evidence that First Kuwaiti played any role the ASBCA appeal proceedings that produced that decision.

39.  On September 1, 2020, the Federal Circuit affirmed the ASBCA ruling in a 2-1 decision.  Ex. D.  The court did not reach the issue of whether the government breached its force protection obligation.  *Id.* at 2.  The court also rejected the government's argument that KBR was required to produce evidence of ***First Kuwaiti's*** costs, explaining that "the amounts paid by KBR to Kuwaiti were 'costs' under the prime contract," and "KBR's obligation was to show that ***the payments to Kuwaiti*** were 'reasonable.'"  *Id.* at 7-8 (emphasis added).

40.  Nonetheless, the court held that KBR had not adequately proved the reasonableness of its costs.  The court noted that "KBR only devotes two pages of its brief to defending the reasonableness of its costs and fails to describe in any detail KBR's cost calculation methodology or why its methodology was reasonable."  Ex. D at 9.  "This alone would justify affirmance, since KBR has not meaningfully briefed the issue."  *Id.*

41.  The court pointed to numerous gaps in KBR's support.  For example, "KBR's spreadsheets calculating idle truck days, 'without substantiating data or records,' were insufficient to establish the reasonableness of its costs."  Ex. D at 12.  The court also faulted KBR for "offer[ing] no fact or expert witnesses to support the reasonableness of its estimated number of idle truck days."  *Id.*  "At bare minimum, KBR was required to support its estimates with representative data as to the number of trucks actually delayed.  In fact, KBR supplied no representative data whatsoever."  *Id.*  Moreover, "KBR only offered conclusory testimony, unsupported by any data or evidence in the record, that the daily rate of $300 was a reasonable

'composite rate' for each truck, trailer, and driver, 'based on [KBR's] market research and . . . pricing data available . . . at the time.'" *Id.*

42.     With respect to double handling, "KBR failed to support the reasonableness of its claimed costs with any record evidence." Ex. D at 14. "Although KBR stated that it 'engaged . . . procurement personnel to obtain pricing from sources other than [First Kuwaiti] to negotiate the double[-]handling claim,' . . . KBR never submitted pricing data from its other sources." *Id.*

43.     The court held that "the Board's determination that KBR had failed to demonstrate that its delay costs were reasonable was supported by substantial evidence" and that "the Board did not err in finding that KBR had failed to prove the reasonableness of its double-handling costs." Ex. D at 14-15. Judge Newman dissented, urging that the court should have remanded the case to the Board so KBR could submit additional evidence. *Id.* at 17-25. As with the ASBCA proceedings, there is no evidence that First Kuwaiti played any role at all in KBR's prosecution of its Federal Circuit appeal.

**IV.     The Tribunal's Award Shifting KBR's Losses to First Kuwaiti**

44.     While KBR's litigation against the government was unfolding, First Kuwaiti and KBR were also arbitrating their own disputes. On January 19, 2009, First Kuwaiti and KBR entered into an Arbitration Agreement that consolidated a number of disputes. **Exhibit S** (ICDR Ex. 99). That agreement provided that disputes would be resolved by arbitration before the International Centre for Dispute Resolution. *Id.* § 1.1. The parties agreed that the tribunal could render separate awards from time to time, which would be final and binding, but that "final monetary awards to a party shall only be issued by the Arbitration Panel to the extent that the total of monetary awards to such party exceeds the total of monetary claims filed by the other party which remain pending before the arbitration panel." *Id.* §§ 5.2, 5.3.

45.     In April 2008, First Kuwaiti filed a demand for arbitration with the ICDR under a different subcontract.  Ex. A ¶ 20.  KBR responded in May 2008 by asserting a counterclaim under Subcontract 11.  *Id.*  That counterclaim remained unresolved for many years as KBR's litigation against the government proceeded.  Once the Federal Circuit ruled against KBR, both parties asked the Tribunal to set a briefing schedule for the counterclaim.  *Id.* ¶¶ 45, 49.

46.     KBR argued that it should be allowed to offset the adverse judgment it suffered in its litigation with the government against amounts it owed to First Kuwaiti.  Ex. A ¶ 141.  KBR claimed that First Kuwaiti was bound by the ASBCA decision based on federal contracting common law and the Special Conditions to Subcontract 11, specifically Section 3.  *Id.* ¶ 142.

47.     First Kuwaiti opposed KBR's claims on multiple grounds.  First, it urged that "KBR directed [First Kuwaiti] to perform additional work, guaranteed [First Kuwaiti] would be paid for that work, and ***unconditionally settled*** the [requests for equitable adjustment] for that work."  Ex. A ¶ 157 (emphasis added).  For that reason, "there was no 'dispute' between [First Kuwaiti] and KBR about the [requests for equitable adjustment], and Section 3.0 (a disputes clause) therefore has no bearing on [First Kuwaiti]."  *Id.*

48.     In addition, "even if one assumes Section 3.0 has relevance, KBR failed to comply with the express notification and participation conditions of that clause."  Ex. A ¶ 157.  Section 3.1 states that "any decision of the Government's Contracting Officer . . . shall bind both [KBR] and [First Kuwaiti] to the extent that it relates to the Subcontract, provided . . . [KBR] ***promptly notifies*** [First Kuwaiti] of the decision."  Ex. E at Special Conditions § 3.1 (emphasis added).  Section 3.3 states that, "[i]f any appeal, suit, or claim is prosecuted by [KBR] under this clause, [First Kuwaiti] ***shall be permitted to participate fully in the prosecution for the purpose of protecting its interests***."  *Id.* § 3.3 (emphasis added).  First Kuwaiti urged that "KBR does not

even assert, much less point to any evidence to prove, that it invited or allowed [First Kuwaiti] to participate in KBR's litigation against the U.S. Government, with the sole exception of [First Kuwaiti's] attendance at a mediation session that ended 10 years ago." Ex. A ¶ 158. "This does not satisfy the 'full participation' condition at Section 3.3 . . . ." *Id.* As First Kuwaiti pointed out, "KBR basically ignores [Section 3.3] altogether. KBR's memorials do not mention it, and KBR did not discuss it at the Hearing." *Id.* ¶ 159.

49. The tribunal rejected First Kuwaiti's arguments and ruled in favor of KBR. Ex. A ¶¶ 173-184. The tribunal acknowledged that KBR's "change orders reflected a ***settlement between KBR and [First Kuwaiti]*** of two [First Kuwaiti] requests for equitable adjustment . . . due to additional work and delays caused by the U.S. Government." *Id.* ¶ 174 (emphasis added); *see also id.* ¶ 178(a) ("KBR paid to [First Kuwaiti] US\$48.75 million ***in settlement*** of the two REAs that [First Kuwaiti] had submitted . . . ." (emphasis added)); *id.* ¶ 178(b) (referring to "the two REA settlements"). Nonetheless, the tribunal held that KBR's settlement with First Kuwaiti was irrelevant because "Sections 3.1 and 3.2 place upon [First Kuwaiti] the risk of unfavorable outcomes in disputes resolution proceedings pursuant to the prime contract between KBR and the U.S. Government." *Id.* ¶ 179. "Whatever the intended effect on the optics of the Parties' dispute," the tribunal asserted, "[First Kuwaiti's] many submissions about KBR having provided 'guarantees' to [First Kuwaiti] is not a serious argument to the contrary." *Id.*

50. The tribunal pointed to KBR's January 2007 email asserting that First Kuwaiti would be bound by the result of KBR's litigation. Ex. A ¶ 181. As the tribunal acknowledged, however, First Kuwaiti never agreed with or otherwise responded to that email. *Id.* ¶ 182. Moreover, the tribunal ignored the multiple communications in which First Kuwaiti said it would ***not*** be bound by the result of KBR's litigation. *See* Ex. M ("DCMA's determinations have no

effect upon the amounts KBR has already paid to [First Kuwaiti] in settlement . . . ."); Ex. Q ("As we have discussed on a number of occasions in the past, [First Kuwaiti] strongly believes that it has no legal obligation to provide contribution or indemnification to KBR with regard to either the Contract 011 or the Martin matters . . . ."). The tribunal never explained why it credited KBR's unilateral statement of its own litigating position while ignoring First Kuwaiti's.

51. The tribunal recognized that Section 3.1 bound First Kuwaiti to the result of KBR's litigation only if "KBR has complied with the notice and appeal requirements" of those provisions. Ex. A ¶ 179. Section 3.1 required KBR to "promptly notif[y]" First Kuwaiti of any "decision of the Government's Contracting Officer." Ex. E at Special Conditions § 3.1. The tribunal asserted that KBR complied with that requirement because "the record establishes that KBR kept [First Kuwaiti] informed of **the DCAA audit process**" and "[First Kuwaiti] participated extensively in the **DCAA audit process** along with KBR." Ex. A ¶ 180 (emphasis added). As support, the tribunal cited emails and other communications from June 2005 to December 2006, some **five years** before the DCMA contracting officer issued his 2011 decision denying KBR's claim. *Compare* Ex. A ¶ 180 n.147 *with id.* ¶ 178(n)-(o). The Tribunal never explained how emails about an earlier audit process from five years **before** a contracting officer's decision could constitute prompt notice of that decision.

52. The tribunal asserted that "[t]here is no dispute that [First Kuwaiti] never asked KBR to pursue an appeal, though the Tribunal is satisfied that [First Kuwaiti] had more than ample opportunity to do so," and that "[i]n any event, KBR did file an appeal on 11 February 2011 of the deemed denial of its certified claim to the DCMA." Ex. A ¶ 183. The tribunal never explained how First Kuwaiti could have had "ample opportunity" to pursue an appeal when KBR **never promptly notified** First Kuwaiti about its November 2010 claim, the deemed denial of that

claim in January 2011, KBR's appeal of that denial in February 2011, or the contracting officer's actual denial of the claim in July 2011. Ex. A ¶178(n)-(o). The only evidence of KBR's communications with First Kuwaiti about that appeal related to a mediation process that began months later, in September 2011. Ex. P.

53.     Finally, the tribunal ignored First Kuwaiti's Section 3.3 argument altogether. That provision requires that, "[i]f any appeal, suit, or claim is prosecuted by [KBR] under this clause, [First Kuwaiti] shall be permitted to *participate fully in the prosecution* for the purpose of protecting its interests." Ex. E at Special Conditions § 3.3 (emphasis added). The section of the Award setting out the parties' arguments recognized that First Kuwaiti alleged a violation of that provision. Ex. A ¶158 ("This does not satisfy the 'full participation' condition at Section 3.3, and KBR does not even attempt to argue otherwise."); *id.* ¶161 & n.120 (quoting argument at hearing). Yet inexplicably, the tribunal's "analysis and conclusions" section simply ignores this claim altogether and does not cite Section 3.3 even once. *Id.* ¶¶173-184.

54.     The tribunal thus held that KBR's adverse judgment in its litigation against the government was binding on First Kuwaiti. As a result, "KBR has no liability for the US$25,708,690 it offset against other amounts owed to [First Kuwaiti], and KBR is entitled to judgment on its affirmative claim to bring the total amount to US$48,754,547." Ex. A ¶184.

55.     Separately, the tribunal ruled in First Kuwaiti's favor on a claim for lost, damaged, or destroyed trucks under a different agreement, Subcontract 190. Ex. A ¶¶115-140. The tribunal awarded KD 23,500 for each of 42 trucks (about $3 to $4 million total). *Id.* ¶¶133, 202(b). The tribunal also rejected KBR's counterclaims under Subcontracts 167 and 190 based on the Martin allegations on the ground that those allegations were still being disputed in other proceedings. *Id.* ¶¶185-199. This motion does not challenge those portions of the Award.

## V.    The Tribunal's Article 30 Ruling

56.    Article 30 of the then-effective ICDR rules provides that, "[w]ithin 30 days after the receipt of an award, any party, with notice to the other parties, may request the tribunal to interpret the award or correct any clerical, typographical or computation errors or make an additional award as to claims presented but omitted from the award."  Ex. B ¶ 22.  Both parties submitted timely applications under that provision.  *Id.* ¶¶ 7, 13.  The tribunal addressed those applications in an October 13, 2022, decision.  Ex. B.

57.    First Kuwaiti argued that the Award was "contradicted by uncontested facts and the plain terms" of Subcontract 11:  "KBR did not promptly notify [First Kuwaiti] of the government's final decision as required by Section 3.1" and "KBR did not allow [First Kuwaiti] any meaningful participation in the litigation as required by Section 3.3."  Ex. B ¶ 17.

58.    The tribunal held that First Kuwaiti's arguments were not a "request for interpretation" or "correction of a clerical, typographical or computation error" and therefore were outside the scope of Article 30.    Ex. B ¶ 23.  Nonetheless, the tribunal addressed the arguments at length, apparently trying to shore up gaps in the Award.  *Id.* ¶¶ 24-38.

59.    With respect to First Kuwaiti's Section 3.3 argument, the tribunal did not deny that the Award *nowhere* responded to that argument, and instead merely mentioned the fact that First Kuwaiti had *made* that argument when summarizing First Kuwaiti's claims.  Ex. B ¶ 24.

60.    The tribunal belatedly responded to the argument by adopting an interpretation that was contrary to the plain terms of Section 3.3 and had never been advanced by any party.  Ex. B ¶¶ 24-30.  As noted above, Section 3.3 states:

> If requested by the CONTRACTOR, SUBCONTRACTOR shall assume the burden or prosecuting for CONTRACTOR any appeal, suit, or claim initiated by CONTRACTOR at SUBCONTRACTOR'S request.  Each party shall cooperate fully in assisting the other party in the proceedings.  If any appeal, suit, or claim is prosecuted by CONTRACTOR under this clause, SUBCONTRACTOR shall be

> permitted to participate fully in the prosecution for the purpose of protecting its interests.

Ex. E at Special Conditions § 3.3.   In other words, the contractor can ask the subcontractor to assume the burdens of the litigation, but if the contractor decides to prosecute the litigation itself, it must allow the subcontractor to "participate fully." *Id.*

61.     Despite that clear language, the tribunal asserted that the first sentence's reference to a suit being "initiated by CONTRACTOR at SUBCONTRACTOR'S request" somehow also applied to the ***third*** sentence too, even though the third sentence contains no similar language. Ex. B ¶¶ 24-25.   The tribunal then reasoned that, because First Kuwaiti "never requested KBR to initiate any appeal, suit or claim," KBR's obligation to allow First Kuwaiti to "participate fully" in the appeal never materialized. *Id.* ¶ 25.

62.     The tribunal failed to grapple with the fact that First Kuwaiti had ***no opportunity*** to instruct KBR to prosecute the appeal because KBR ***never timely notified*** First Kuwaiti of the contracting officer's decision.   The tribunal stated that KBR at some point sent the decision to First Kuwaiti's outside counsel in connection with the mediation, months ***after*** KBR had already filed the appeal.   Ex. B at 31.   But the tribunal never explained how those facts established that KBR provided prompt notice of the decision ***at the time it was rendered***.

63.     The tribunal accordingly denied First Kuwaiti's Article 30 request.   Ex. B at 38.

64.     KBR, meanwhile, requested that the tribunal "clarify" the Award by offsetting various amounts, some of which were stated in different currencies.   Ex. B ¶¶ 39-41.   The tribunal granted that request in part, interpreting the relationship between two amounts in paragraph 202(h).   *Id.* ¶¶ 46, 53(b).   The tribunal otherwise denied the request.   *Id.* ¶ 53(b).

65.     First Kuwaiti now files this motion to vacate the Award to the extent it granted relief to KBR on its Subcontract 11 counterclaim.

# **ARGUMENT**

66.     Section 10 of the Federal Arbitration Act provides:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration –

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10. The Fourth Circuit has not hesitated to vacate awards when one of those defects was shown. *See, e.g.*, *Williamson Farm v. Diversified Crop Ins. Servs.*, 917 F.3d 247, 257-58 (4th Cir. 2019) (arbitrator "exceeded her powers" by "awarding extracontractual damages"); *Raymond James Fin. Servs., Inc. v. Bishop*, 596 F.3d 183, 193 (4th Cir. 2010).

67.     In addition, "permissible common law grounds for vacating [an arbitral] award . . . include those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006); *see also Williamson Farm*, 917 F.3d at 253 (same); *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 483 (4th Cir. 2012) (holding that "manifest disregard continues to exist as either 'an independent ground for review or as a judicial gloss'" on the statutory grounds). "[A] manifest disregard of the law is established only where the 'arbitrator[] understand[s] and correctly state[s] the law, but proceed[s] to disregard the same.'" *Patten*, 441

F.3d at 235. "An arbitration award fails to draw its essence from the agreement only when the result is not 'rationally inferable from the contract.'" *Id.*

68.     "[A]lthough the authority of an arbitrator is broad, and subject to great deference under the applicable standard of review, 'it is not unlimited.'" *Patten*, 441 F.3d at 235. "[A]n arbitrator has acted in manifest disregard of the law if he 'disregard[s] or modif[ies] unambiguous contract provisions.'" *Id.*; *see also Dewan v. Walia*, 544 F. App'x 240, 245-46 (4th Cir. 2013). "[A]n award fails to draw its essence from the agreement if an arbitrator has 'based his award on his own personal notions of right and wrong.'" *Patten*, 441 F.3d at 235. "In such circumstances, a federal court has 'no choice but to refuse enforcement of the award.'" *Id.*; *see, e.g.*, *Patten*, 441 F.3d at 236-37 (arbitrator manifestly disregarded the law by implying a one-year limitations period that "contradicted the plain and unambiguous terms of the Management Agreement"); *Dewan*, 544 F. App'x at 245-46 (arbitrator manifestly disregarded the law by allowing party to arbitrate claims previously released); *Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC*, 519 F.3d 200, 207-09 (4th Cir. 2008) (award "did not draw its essence from the Franchise Agreement" where it was "made without notification . . . as required by the Franchise Agreement"); *U.S. Postal Serv. v. Am. Postal Workers Union*, 46 F. Supp. 2d 457, 461 (E.D. Va. 1999) (vacating award prohibited by contract's "clear and unequivocal language").

69.     Those principles furnish several grounds for vacating the Award here.

**I.      The Tribunal Awarded Damages on Claims That KBR Had Already Settled**

70.     The tribunal manifestly disregarded the law by arbitrating claims that KBR had already settled. The tribunal awarded KBR $48.75 million in damages for its Subcontract 11 counterclaim even though KBR had already settled that claim with First Kuwaiti.

71.     Subcontract 11 is governed by Texas law. Ex. E at General Conditions § 9.2. In Texas, as in any state, a party that has already settled a claim cannot relitigate the claim, even if a

court would decide it differently. "[V]oluntary settlements are so favored, that . . . a compromise into which [the parties] have voluntarily entered must stand and be enforced, . . . although the disposition made by the parties in their agreement may not be that which the court would have decreed, had the controversy been brought before it for decision." *Houston & T.C.R. Co. v. McCarty*, 94 Tex. 298, 301, 60 S.W. 429, 430 (Tex. 1901), *overruled on other ground by Williams v. Glash*, 789 S.W.2d 261 (Tex. 1990); *see also, e.g.*, *Matter of W. Tex. Mktg. Corp.*, 12 F.3d 497, 502 (5th Cir. 1994) ("The settlement . . . was a final decision on the merits and cannot be altered by an attempt to resurrect the controversy in a subsequent proceeding."); 12A Texas Jurisprudence 3d *Compromise and Settlement* § 10 (rev. 2022).

72. That principle is so well-settled that an arbitral tribunal manifestly disregards the law if the tribunal fails to apply it. The Fourth Circuit's decision in *Dewan v. Walia*, 544 F. App'x 240 (4th Cir. 2013), is directly on point. In that case, an employee "agreed to 'release and discharge' [his employer] from claims related to [his] employment in exchange for $7,000." *Id.* at 246. But the tribunal allowed the employee to arbitrate employment-related claims anyway. *Id.* at 247. The Court held that "neither linguistic gymnastics, nor a selective reading of [state] contract law, could support [the arbitrator's] conclusion that the Release was enforceable but that [the employee's] claims were arbitrable anyway." *Id.* at 248. The Court held that "the Arbitrator manifestly disregarded the law by holding the Release valid and enforceable but nevertheless arbitrating Walia's counterclaims arising out of his employment with the Company." *Id.*

73. The Second Circuit has similarly held that an arbitrator manifestly disregards the law by arbitrating a claim despite a prior settlement. In *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105 (2d Cir. 2019), the court "agree[d] with the district court's conclusion that the arbitrator ignored the unambiguous general release provision in [a] settlement agreement." *Id.* at 107. The court

ordered the district court to remand the case to the arbitrator to address another issue and then vacate or modify the award if necessary. *Id.* at 111.

74.    This case is no different. The tribunal recognized that KBR **settled** First Kuwaiti's claims relating to the two change orders. KBR's "change orders reflected a **settlement between KBR and [First Kuwaiti]** of [the] two [First Kuwaiti] requests for equitable adjustment . . . due to additional work and delays caused by the U.S. Government." Ex. A ¶ 174 (emphasis added); *see also id.* ¶ 178(a) ("KBR paid to [First Kuwaiti] US$48.75 million **in settlement** of the two REAs . . . ." (emphasis added)); *id.* ¶ 178(b) ("settlements"). First Kuwaiti originally demanded more than $70 million for the additional work, but "KBR reviewed, analyzed, and negotiated the [requests] to a total **settlement** amount of $48,754,547, nearly $30 million less than [First Kuwaiti] initially sought." Ex. F at 6-7 (emphasis added).

75.    Having chosen to settle with First Kuwaiti over the amount due, KBR could not come back later and claw back those amounts merely because KBR suffered a defeat in its own litigation against the government. The whole point of a settlement is to resolve the parties' dispute. KBR gave up any right to rely on Sections 3.1 and 3.2 or any other principle to bind First Kuwaiti to the outcome of its litigation with the government by **settling** the claim.

## II.    The Tribunal Modified the Unambiguous Terms of Section 3.1

76.    The tribunal also manifestly disregarded the law by ignoring the unambiguous language of Section 3.1. That section permits KBR to bind First Kuwaiti to a "decision of the Government's Contracting Officer" under its prime contract **only** if "CONTRACTOR promptly notifies SUBCONTRACTOR of the decision." Ex. E at Special Conditions § 3.1. The tribunal never made any finding in the Award that KBR promptly notified First Kuwaiti about the contracting officer's decision. Instead, the tribunal held that KBR complied with Section 3.1 merely because First Kuwaiti was aware of an ongoing audit **five or six years earlier**.

77.     "[A]n arbitrator has acted in manifest disregard of the law if he 'disregard[s] or modif[ies] **unambiguous contract provisions**.'" *Patten*, 441 F.3d at 235 (emphasis added); *see also Dewan*, 544 F. App'x at 245-46 (same).  In *Patten*, for example, the Fourth Circuit vacated an award where the arbitrator implied a one-year limitations period that "contradicted the plain and unambiguous terms of the Management Agreement."  *Id.* at 236-37.  In *Choice Hotels*, the court vacated an award where the tribunal disregarded the unambiguous terms of the contract's service provisions.  519 F.3d at 207-09.  And in *U.S. Postal Service*, this Court vacated an award because the arbitrator disregarded the "clear and unequivocal language" of a collective bargaining agreement.  46 F. Supp. 2d at 461.

78.     The tribunal here likewise "disregard[ed] or modif[ed] unambiguous contract provisions."  *Patten*, 441 F.3d at 235.  Section 3.1 unambiguously required KBR to "promptly notif[y] [First Kuwaiti]" of the "decision of the Government's Contracting Officer."  Ex. E at Special Conditions § 3.1; *see also id.* § 3.2 (similar for appeal decisions).  The relevant "decision" at issue was either the contracting officer's deemed denial of KBR's claim in January 2011 or his actual written denial of the claim in July 2011.  Ex. A ¶ 178(n)-(o); Ex. O.  Those were the final appealable decisions that gave rise to the ASBCA and Federal Circuit appeals and to which KBR is now trying to "bind" First Kuwaiti under Sections 3.1 and 3.2.

79.     The tribunal never found that KBR provided prompt notice of those decisions in January 2011 or July 2011.  The Award's only paragraph addressing this issue asserts that KBR complied with Section 3.1 because "the record establishes that KBR kept [First Kuwaiti] informed of **the DCAA audit process**" and "[First Kuwaiti] participated extensively in the **DCAA audit process**."  Ex. A ¶ 180 (emphasis added).  The tribunal cited emails and other communications from June 2005 to December 2006, **five to six years** earlier.  *Id.* ¶ 180 n.147.

80.     That ruling "disregard[ed] or modif[ed] unambiguous contract provisions." *Patten*, 441 F.3d at 235.  Section 3.1 unambiguously refers to prompt notice of the ***contracting officer's decision***, not prompt notice of an audit process carried out by a different government entity five to six years earlier.  The tribunal simply rewrote the contract to replace "decision of the Government's Contracting Officer" with "DCAA audit process."  That modification of unambiguous contract language was a manifest disregard of the law.

81.     That is no minor technical discrepancy.  The reason Section 3.1 requires prompt notice of the ***contracting officer's decision*** is that Section 3 grants the subcontractor potent rights with respect to such a decision.  Under Section 3.1, the subcontractor can demand that the contractor "appeal[] the decision in accordance with the Disputes clause of the Prime Contract" and "take[] whatever further action is required under this clause."  Ex. E at Special Conditions §3.1.  And under Section 3.3, the subcontractor "shall be permitted to participate fully in the prosecution for the purpose of protecting its interests," *id.* §3.3 – a right that, according to the tribunal's Article 30 decision, the subcontractor possesses ***only*** if the subcontractor directed the contractor to prosecute the appeal in the first place.  Ex. B ¶¶24-25.  What matters to the subcontractor's ability to exercise those important rights is whether the contractor provides prompt notice of the ***decision***.  Awareness of an audit five years earlier is beside the point.

82.     The tribunal's willful rewriting of Section 3.1 also gives rise to an additional ground for vacatur.  Under Section 10(a)(4) of the Federal Arbitration Act, a court should set aside an award where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  A tribunal "lacks authority to decide questions the parties have not agreed to submit to him."  *Courier-Citizen Co. v. Bos. Electrotypers Union No. 11*, 702 F.2d 273, 281 (1st

Cir. 1983); *see also PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp. 2d 631, 638 (E.D. Pa. 2009). Here, the parties "submitted" the question of whether KBR complied with Section 3.1 by promptly notifying First Kuwaiti of the contracting officer's decision, yet the tribunal failed to decide that issue, instead relying on an audit five years earlier. Because the tribunal failed to resolve the critical issue submitted for decision, Section 10(a)(4) of the Federal Arbitration Act provides an additional ground for vacatur.

### III. The Tribunal Ignored First Kuwaiti's Section 3.3 Argument

83. Finally, the tribunal manifestly disregarded the law by ignoring First Kuwaiti's Section 3.3 argument. Section 3.3 states that, "[i]f any appeal, suit, or claim is prosecuted by CONTRACTOR under this clause, SUBCONTRACTOR shall be permitted to ***participate fully in the prosecution*** for the purpose of protecting its interests." Ex. E at Special Conditions § 3.3 (emphasis added). The tribunal recognized that First Kuwaiti asserted a claim under that provision: The section of the Award summarizing the parties' arguments refers to it multiple times. Ex. A ¶¶ 158-159. Nonetheless, the section of the Award analyzing and resolving the dispute ignores that claim altogether. *Id.* ¶¶ 173-184. In other words, the tribunal recognized that First Kuwaiti asserted a Section 3.3 argument, but simply failed to address it.

84. That failure to address First Kuwaiti's Section 3.3 argument is grounds for vacatur. A tribunal manifestly disregards the law if it "disregard[s] or modif[ies] unambiguous contract provisions." *Patten*, 441 F.3d at 235. By failing to respond to First Kuwaiti's Section 3.3 argument, the tribunal effectively read that provision out of the subcontract entirely, thereby "disregard[ing]" an "unambiguous contract provision[ ]." *Id.*

85. The tribunal's failure to address First Kuwaiti's Section 3.3 argument is also grounds for vacatur under the FAA. By disregarding that properly argued defense, the tribunal "so imperfectly executed [its powers] that a mutual, final, and definite award upon the subject

25

matter submitted was not made." 9 U.S.C. § 10(a)(4); *see also PMA Capital*, 659 F. Supp. 2d at 638 (award "not rationally derived from the parties' submissions").

86.     In its Article 30 decision, the tribunal tried to patch up that defect in the Award by inventing a brand new theory, never advanced by any party, for why Section 3.3 did not apply. There are multiple problems with that post hoc effort to salvage the Award.

87.     First, the tribunal relied on a theory of its own creation that had never been advanced by either party at any point during the arbitration or the Article 30 briefing – namely, that Section 3.3 applies only when the subcontractor directs the contractor to pursue the litigation. Ex. B ¶¶ 24-25. By relying on that *sua sponte* theory, the tribunal denied First Kuwaiti a meaningful opportunity to present any arguments in response. Under Section 10(a)(3) of the Federal Arbitration Act, the Court should vacate an award where "the arbitrators . . . refus[ed] to hear evidence pertinent and material to the controversy; or . . . any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). Under that provision, a tribunal must "give each party an adequate opportunity to present its evidence and arguments." *In re A.H. Robins Co.*, 238 B.R. 300, 316 (E.D. Va. 1999); *see also Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (similar). By relying on a new theory to which First Kuwaiti had no opportunity to respond, the tribunal violated that provision.

88.     Second, the tribunal's post hoc interpretation was such a blatant departure from the text of Section 3.3 that it was a manifest disregard of the law. Again, that provision states:

> 3.3 If requested by the CONTRACTOR, SUBCONTRACTOR shall assume the burden or prosecuting for CONTRACTOR any appeal, suit, or claim initiated by CONTRACTOR at SUBCONTRACTOR'S request. Each party shall cooperate fully in assisting the other party in the proceedings. If any appeal, suit, or claim is prosecuted by CONTRACTOR under this clause, SUBCONTRACTOR shall be permitted to participate fully in the prosecution for the purpose of protecting its interests.

Ex. E at Special Conditions § 3.

89.     That provision is unambiguous:  If the subcontractor asks the contractor to bring suit, the contractor can require the subcontractor to prosecute the litigation, but both parties must "cooperate fully in assisting the other party in the proceedings."  By contrast, if the **contractor** prosecutes the litigation, the subcontractor must be permitted to "participate fully in the prosecution" in order to protect its interests.

90.     The tribunal reasoned that, because the **first** sentence of the provision applies only when the "appeal, suit, or claim [is] initiated by CONTRACTOR at SUBCONTRACTOR'S request," that condition should also be read into the **third** sentence too.  Ex. B ¶¶ 24-25.  That is a completely atextual interpretation.  If the parties had wanted that condition to apply to both sentences, they would have included it in both.  Instead, they included that language only in the first sentence, **omitting** it from the third.  The tribunal manifestly disregarded the law by inserting language where the parties omitted it.  *Cf. Patten*, 441 F.3d at 236-37 (vacating award where arbitrator implied a one-year limitations period into a contract on the ground that the parties had included it in a prior contract, even though they omitted it from the later one).

91.     Moreover, the tribunal ignored that Section 3.3 sets forth **alternative** scenarios, each preceded by its own "If" clause.  The first two sentences address the situation where the **subcontractor** prosecutes the claims and state that, in that scenario, both parties must "cooperate fully in assisting the other party in the proceedings."  The third sentence addresses the scenario where the **contractor** prosecutes the claim and states that, in that scenario, the subcontractor must be permitted to "participate fully in the prosecution."  Given that two-prong structure, it makes no sense to borrow language from the first sentence and insert it into the third.

92.     Finally, the tribunal's interpretation defies common sense.  If the basic purpose of Section 3 is to bind the subcontractor to the outcome of litigation to which it is not a party, the subcontractor has an overwhelming interest in participating in the litigation, regardless of the happenstance of which party initiates the appeal.  Yet under the tribunal's interpretation, the subcontractor may have no right whatsoever to participate even though the litigation could have a drastic impact on its rights.  That is an absurd result that the tribunal should have striven to avoid if at all possible.  *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022) (Texas courts "avoid constructions of contract language that would lead to absurd results").

93.     First Kuwaiti's Section 3.3 claim was a pillar of its defense.  There was ample evidence that KBR did not "permit[ ] [First Kuwaiti] to participate fully in the prosecution for the purpose of protecting its interests."  Ex. E at Special Conditions § 3.3.  The ***only*** evidence that KBR allowed First Kuwaiti to participate at all in the appeal proceedings concerned the mediation at the end of 2011 and start of 2012.  Ex. P.  But as the tribunal observed, "[First Kuwaiti] had only a limited role in that mediation:  '[T]hey're not a party to the mediation, they are not the decisionmaker . . . .' " Ex. A ¶ 158 n.119.  And while First Kuwaiti had a "limited role" in the mediation, it had ***no role whatsoever*** in the next six years of proceedings at the ASBCA or the appeal to the Federal Circuit.

94.     That non-participation was not for lack of trying.  Immediately after the mediation, First Kuwaiti wrote to KBR, stating:  "[First Kuwaiti] stands ready to continue to provide whatever assistance it can to KBR to help you obtain a fair resolution of this dispute through the formal appeals process."  Ex. Q.  A month later, First Kuwaiti reiterated:  "I called you earlier today to check in, but also to inquire how [First Kuwaiti] might coordinate to assist KBR in its efforts to achieve the best possible outcome in the ASBCA proceeding.  I look

forward to hearing from you." Ex. R. There is no evidence that KBR responded to those entreaties, let alone allowed First Kuwaiti to participate meaningfully in the appeals.

95.     First Kuwaiti's participation could well have made a difference. The Federal Circuit rejected KBR's claims primarily because of KBR's deficient presentation of the issues, not the underlying merits. The court faulted KBR for "only devot[ing] two pages of its brief to defending the reasonableness of its costs" and "fail[ing] to describe in any detail KBR's cost calculation methodology or why its methodology was reasonable." Ex. D at 9. KBR's presentation was so lacking that KBR had not even "meaningfully briefed the issue." *Id.* The court identified numerous gaps in KBR's analysis. *See id.* at 12 (no "substantiating data or records"); *id.* ("no fact or expert witnesses"); *id.* ("no representative data whatsoever"); *id.* (only "conclusory testimony, unsupported by any data or evidence"); *id.* at 14 (no "record evidence"); *id.* (no "pricing data from its other sources").

96.     Under the tribunal's construction, KBR could exclude First Kuwaiti from the appeal, make only an inept and half-hearted attempt to prevail, and then shift all the resulting losses onto First Kuwaiti. That is precisely what KBR did. The result was a miscarriage of justice that offends basic notions of due process. Nothing in Section 3 envisions that patently unfair process, and the tribunal manifestly disregarded the law by ignoring and then distorting the contract provisions designed to prevent that result.

## **CONCLUSION**

97.     For the foregoing reasons, First Kuwaiti respectfully requests that the Court enter

an order (a) granting this motion; (b) vacating the Award insofar as the tribunal ruled in KBR's

favor on the Subcontract 11 claim; (c) awarding fees, costs, and interest that may be recoverable

in this proceeding; and (d) granting such other and further relief the Court deems just and proper.


Dated:    January 5, 2023                                  Respectfully submitted,
          Washington, D.C.

                                                           _____/s/_____
                                                           Eric R. Nitz (Va. Bar No. 82471)
                                                           Robert K. Kry (*pro hac vice* forthcoming)
                                                           Robert Y. Chen (*pro hac vice* forthcoming)
                                                           MOLO LAMKEN LLP
                                                           The Watergate, Suite 500
                                                           600 New Hampshire Avenue, N.W.
                                                           Washington, D.C.  20037
                                                           (202) 556-2021 (telephone)
                                                           (202) 536-2021 (facsimile)
                                                           enitz@mololamken.com

                                                           *Attorneys for Movant First Kuwaiti*
                                                           *General Trading & Contracting W.L.L.*